UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

ANTHONY ELDER,

                         Plaintiff,

                 v.

COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**

15-CV-7370 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Anthony Elder filed the above-captioned action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for social security disability benefits under the Social Security Act (the "SSA"). Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that Administrative Law Judge Alan B. Berkowitz (the "ALJ") erred in weighing the medical evidence, thus rendering deficient the residual functional capacity ("RFC") and the ALJ's hypotheticals to the vocational expert. (Pl. Mot. for J. on the Pleadings, Docket Entry No. 12; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 13.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's decision is supported by substantial evidence and should be affirmed. (Comm'r Cross-Mot. for J. on the Pleadings, Docket Entry No. 14; Comm'r Mem. in Opp'n to Pl. Mot. and in Supp. of Def. Cross-Mot. ("Comm'r Mem."), Docket Entry No. 15.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted, the Commissioner's cross-motion for judgment on the pleadings is denied, and the case is remanded for further proceedings consistent with this Memorandum and Order.

## I. Background

Plaintiff was born in 1971. (Certified Admin. Record ("R.") 131, Docket Entry No. 7.) Plaintiff has a high school education. (R. 17, 156.) He was employed as a customer service representative for Verizon between January of 1997 and July of 2012. (R. 156.) On August 6, 2012, Plaintiff applied for disability benefits, alleging he was disabled as of July 3, 2012 due to mental illness and a right ankle injury. (R. 131, 152, 155.) Plaintiff's application was denied after initial review, and he requested a hearing before the ALJ. (R. 93–106.) Plaintiff appeared with his attorney before the ALJ on August 13, 2014. (R. 11–38.) By decision dated September 19, 2014, the ALJ determined that Plaintiff was not disabled and denied Plaintiff's application. (R. 76–90.) On December 18, 2015, the Appeals Council denied review of the ALJ's decision. (R. 1–6.) Plaintiff commenced this action on December 29, 2015. (Compl., Docket Entry No. 1.) The parties completed the briefing of their motions on January 3, 2017. (Docket Entry Nos. 12 and 14.)

### a. Plaintiff's testimony

Plaintiff is right-handed. (R. 16.) Plaintiff lives with his father and twelve-year-old son in a first-floor apartment. (R. 16–17.) He does not drive. (R. 17.) Plaintiff ceased working in July of 2012 and tried to return to work in 2013 but was unable to "complete" a week of work because he was unable to sit for extended periods of time and had difficulty focusing. (R. 18–19.) Plaintiff does not leave his house often, even though he has friends. (R. 30.) He has trouble reading at home because he is unable to focus. (R. 30–31.) Plaintiff does not complete any housework and his father takes him to medical appointments. (R. 30, 32.) Plaintiff is able to sketch, which he does with his right hand for approximately ten minutes a day "on a good day." (R. 31–32.)

Plaintiff has chronic back pain that runs down his leg, which began after he was in a car accident in December of 2012. (R. 20, 27.) Plaintiff broke his ankle in 2012 and has neck pain that runs down his left arm and causes numbness in his left arm elbow. (R. 20, 22.) He is unable to type and can only grip a pen for five to ten minutes. (R. 22–23.) Plaintiff can only sit for fifteen-to-twenty minutes before he needs to stand up and cannot sit for an hour during an eight-hour day. (R. 24–25.) Plaintiff can only stand for fifteen minutes during the course of an eight-hour workday. (R. 26.) Plaintiff cannot lift more than four or five pounds, cannot bend and has trouble moving his neck and body side to side, squatting, tying his shoes and putting on socks. (R. 25.) Plaintiff has asthma that is aggravated by the climate, stress and other environmental factors including pollen, fumes and allergies. (R. 20–21, 26.)

Plaintiff first sought psychiatric treatment approximately ten years before the hearing for help with depression. (R. 21.) He began treatment with his current psychiatrist in April of 2013 because he felt as though "his life was over . . . because [he] couldn't work." (*Id.*) Plaintiff was hospitalized for four days for intense thoughts of suicide. (R. 29–30, 31.) Plaintiff also suffers from anxiety when he is unable to complete a task. (R. 31.) Plaintiff takes psychiatric medications. (R. 31.)

At the time of the hearing, Plaintiff was seeing Dr. Ragna C. Krishna, a neurologist, and also Dr. Mike Hedinachya. (R. 23.) Plaintiff began seeing Dr. Krishna on a monthly basis in January of 2013. (R. 29.) Plaintiff received epidural injections in his neck and lower back. (R. 23.) Plaintiff was prescribed Lyrica and also took Flexeril, a muscle relaxer, which caused him to suffer from fatigue. (R. 24.) Plaintiff also wore a back brace when traveling and as needed. (R. 29.)

### b. Vocational expert testimony

Vocational expert Helene Feldman testified at the ALJ hearing and categorized Plaintiff's past work as a customer complaint clerk as sedentary with a specific vocational preparation (SVP) of five. Feldman testified that a hypothetical person of Plaintiff's age, education and work experience who was limited to sedentary work with occasional use of his non-dominant hand for fingering and fine manipulation limited to occasional exposure to respiratory irritants, extreme cold, extreme heat and concentrated vapors, could perform Plaintiff's past work. (R. 33.) However, if further limited to performing simple tasks, understanding simple instructions and working in a low-stress environment, the individual would not be able to perform Plaintiff's past work. (R. 34.) But the individual would be able to perform work as a ticket checker, document preparer or order clerk. (R. 34–35.) The same work could be performed by someone who could only stand for one hour. (R. 36.) There would not be work available if that same person were off-task twenty percent of the time. (R. 35.)

### c. Medical evidence

#### i. Treating physicians

##### 1. Dr. Eric Gordon

Plaintiff began seeing Eric Gordon, M.D. on July 23, 2012 for a right ankle fracture resulting in stiffness and severe low back pain. (R. 204.) On January 17, 2013, Dr. Gordon completed a form for the New York State Office of Temporary and Disability Assistance Division of Disability Determinations. (R. 204–08.) Dr. Gordon found tenderness to palpation of Plaintiff's right distal tibia with limited range of motion of dorsiflexion-platarflexion; severe low back pain; and tenderness to palpation of the lumbar paraspinals with limited range of motion. (R. 205.) Dr. Gordon did not find distal radiation or neurological changes. (R. 205.)

Dr. Gordon noted evidence of fracture was present and stated that Plaintiff would be able to engage in full weight-bearing by November 12, 2012, which had already passed by the January 2013 examination. (R. 205.) An x-ray showed a healed right ankle fracture "with minimal medical clear space widening." (R. 205.) Dr. Gordon opined that Plaintiff was limited in his ability to "push and/or pull (including hand and foot controls)" due to his ankle. (R. 206.) Dr. Gordon indicated that Plaintiff had between zero-and-thirty-degree lumbar region flexion extension, five-degree lateral flexion rotation to the right and left, five-degree dorsiflexion in his right ankle and twenty-degree in his left, and fifteen-degree plantar-flexion in his right ankle and forty-degree in his left. (R. 208.) Imaging of Plaintiff's thoracic and lumbar spine on December 18, 2012 showed levoscoliosis of the lumbar spine and dextroscoliosis of the thoracic spine. (R. 300.)

### 2. Dr. Ranga Krishna

Plaintiff was first seen by neurologist Ragna C. Krishna, M.D., on January 21, 2013. (R. 266.) In a May 15, 2013 report, Dr. Krishna reported the findings and recommendations from Plaintiff's five monthly appointments between January and May of 2013. (R. 266–68.) Dr. Krishna diagnosed Plaintiff with multilevel cervical and lumbar disc herniations resulting in cervical and lumbar radiculopathy and vestibular dysfunction resulting in dizziness. (R. 266.) Plaintiff received physical therapy and pain management treatments. (R. 266.)

Dr. Krishna reported that Plaintiff had difficulty sitting and standing. (R. 266.) Plaintiff was cooperative, alert and oriented to person, place and time. His communication ability, remote and recent insight, judgment, proverb interpretation and mood and affect were all within normal limits; as were his calculations, "reversals," spelling, right to left orientation, ability to follow commands, identify body parts, and face and hand tests. (R. 267.) Plaintiff exhibited normal

motor system examination results except four out of five weakness in the deltoid, supraspinatus, biceps muscles, extensor halluces longus, transverse abdominis, and gluteus maximus muscles on the right side. (R. 267.) Plaintiff had a positive Tinel sign[1] at the wrist bilaterally as well as a positive Braxton-Hallpike maneuver[2] "with the left head down position." (R. 267.)

Dr. Krishna measured Plaintiff's spinal range of motion with objective testing performed with a bedside compass. (R. 267.) Plaintiff's cervical spine range of motion included: flexion of thirty degrees, extension of ten-to-twenty degrees, lateral flexion of twenty-to-thirty degrees and rotation of eighty degrees.[3] (R. 267.) Plaintiff's lumbar spine range of motion included: flexion of thirty-to-fifty degrees, extension of ten-to-fifteen degrees and lateral rotation of ten-to-fifteen degrees.[4] (R. 267.) Plaintiff had decreased sensation on the outer aspect of the right leg and arm. (R. 267.) Plaintiff's deep tendon reflexes were "2+" and symmetrical with flexor plantar responses bilaterally, except for the right ankle and biceps jerks which were "1+." (R. 268.)

Dr. Krishna opined that Plaintiff's range of motion was fifty to seventy percent below normal and it "functionally impair[ed] him from performing [] work activities." (R. 268.) Dr.

---

[1] *Clark v. Colvin*, No. 13-CV-1124, 2016 WL 4804088, at *1 n.2 (W.D.N.Y. Sept. 13, 2016) ("A positive Tinel's sign indicates an irritated nerve. Tinel's sign is positive when lightly banging (percussing) over the nerve elicits a sensation of tingling, or 'pins and needles,' in the distribution of the nerve.")

[2] *Michaels v. Colvin*, No. 12-CV-9213, 2014 WL 641463, at *5 n.8 (S.D.N.Y. Feb. 18, 2014) ("The Hallpike maneuver is a 'test for eliciting paroxysmal vertigo and nystagmus in which the patient is brought from the sitting to the supine position with the head hanging over the examining table and turned to the right or left; vertigo and nystagmus are elicited when the head is rotated toward the affected ear.'" (quoting *Stedman's Medical Dictionary* (27th ed. 2000))), *rev'd*, 621 F. App'x 35 (2015).

[3] Normal cervical measures include flexion between forty-five and sixty degrees, extension of forty-five degrees and lateral flexion of forty-five degrees. (R. 267.)

[4] Normal lumbar measures include flexion of ninety degrees, extension of thirty degrees and lateral rotation of thirty degrees. (R. 267.)

Krishna also opined that Plaintiff's positive Braxton-Hallpike maneuver and dizziness secondary to vestibulopathy were functionally impairing him from obtaining gainful employment. (R. 268.) Dr. Krishna's prognosis was "guarded" due to the nature, severity and permanency of Plaintiff's injuries. (R. 268.)

On January 21, 2013, Dr. Krishna's impressions from electrodiagnostic studies were evidence of chronic right C5-C6 cervical radiculopathy and moderate bilateral sensorimotor median nerve neuropathy at the wrist, consistent with a clinical diagnosis of Carpal Tunnel Syndrome. (R. 234–38.) On January 23, 2013, Plaintiff had magnetic resonance imaging ("MRI") of his cervical and lumbar spine that Dr. Krishna ordered. (R. 209, 211.) Narayan Paruchuri, M.D., had the following impressions based on the MRI: board-based central disc herniation and a diffuse disc bulge with anterior thecal sac impingement and bilateral foraminal impingement at the C6-C7 level, (R. 209–10); disc bulge and right and left foraminal herniation, with bilateral foraminal impingement that was severe on the right and significant on the left, and anterior thecal sac impingement at the C5-C6 level, (R. 210); diffuse disc bulge and left foraminal herniation with anterior thecal sac impingement and left foraminal impingement at the C4-C5 level, (R. 210); disc bulge and right foraminal herniation, with right foraminal impingement, anterior thecal sac impingement and to a lesser degree left foraminal impingement at the C3-C4 level, (R. 210); and disc bulge with anterior thecal sac impingement but no foraminal impingement at the L2-L3 level, (R. 211). On February 4, 2013, Dr. Krishna's impressions from electrodiagnostic studies was evidence of right L5-S1 lumbosacral radiculopathy. (R. 229–33.)

On June 17, 2013, Dr. Krishna examined Plaintiff and found he was alert, awake and oriented to time, place and person. (R. 251.) Plaintiff had an antalgic gait. (R. 251.) Dr.

Krishna noted moderate tenderness and muscle spasms in the upper trapezius and paraspinal muscles. Plaintiff had a positive Spurling sign.[5] (R. 252.) Plaintiff's cervical spine range of motion included flexion of forty degrees, extension of twenty-five degrees, lateral rotation of forty degrees bilaterally and lateral flexion of twenty degrees bilaterally. (R. 252.) Plaintiff's lumbar spine range of motion included flexion of eighty degrees, extension of twenty degrees, rotation of twenty degrees bilaterally, and lateral flexion of fifteen degrees bilaterally. (R. 252.) Dull sharp pains and muscle spasms were noted in both the cervical and lumbar spine. (R. 252.) Straight leg-raising test was sixty degrees on the right and forty degrees on the left. (R. 252.) Deep tendon reflexes were "2+" and symmetrical, except for the left biceps and Achilles, which were "1+." (R. 253.) Plaintiff had diminished sensation to light touch over both legs L5-S1 dermatomes and over the left arm C5-C6 dermatomes. (R. 253.) Muscles in the upper and lower extremities were symmetrical with normal motor tone and no atrophy noted. (R. 253.) Muscle strength was four out of five on the left. (R. 253.) Dr. Krishna noted chronic right C5-C6 radiculopathy and right L5-S1 radiculopathy as well as disc bulging in the lumbar and cervical spine. (R. 253.) Dr. Krishna's impressions were the same as reported in his May 2013 report. (R. 253.) Dr. Krishna prescribed Lyrica and continued physical therapy. (R. 254.) Examination findings, diagnostic testing and Dr. Krishna's impressions and recommendations remained unchanged upon Plaintiff's July 2 and July 29, 2013 examinations. (R. 247–50, 255–58.)

On September 30, 2013, Dr. Krishna indicated in a letter that Plaintiff had a diagnosis of cervical and lumbar radiculopathy and "cervical spine surgery" is "pending." (R. 246.) Dr.

---

[5] A Spurling test is an "evaluation for cervical nerve root impingement in which the patient extends [his] neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." *Guy v. Astrue*, 615 F. Supp. 2d 143, 149 n.6 (S.D.N.Y. 2009) (quoting *Stedman's Medical Dictionary*).

Krishna noted Plaintiff's symptoms are constant and he is "totally disabled" and had a "guarded" prognosis. (R. 246.)

On October 29, 2013 and November 26, 2013, Dr. Krishna saw Plaintiff for persistent neck and back pain and diagnosed him with cervical and lumbar spine radiculopathy as well as post-traumatic stress disorder. (R. 244–45.) Dr. Krishna noted Plaintiff's prognosis was guarded and that he was "totally" disabled. (R. 244–45.) Dr. Krishna also noted that Plaintiff's conditions and symptoms were not improving but that Plaintiff should continue therapy, medication and pain management. (R. 244–45.)

Dr. Krishna completed a functional capacities evaluation on October 29, 2013. (R. 295–98.) Plaintiff reported that he requires seventy-five percent assistance with household activities such as cleaning, cooking, vacuuming, grocery shopping and laundry. (R. 296.) Plaintiff also indicated that he requires assistance from his son with upper- and lower-body dressing. (R. 296.) Dr. Krishna reported that Plaintiff was cooperative with the testing procedures but refused to complete some of the lifting activities due to pain and weakness in his neck and lower back muscles. (R. 296.) Plaintiff rated his neck and lower back pain as an eight on a scale of zero to ten. (R. 296.) Plaintiff was able to stand for approximately ten minutes, lift approximately two pounds and bend forward and rotate in a sitting position. (R. 296.) Dr. Krishna noted that Plaintiff's functional capabilities were limited by: increased lower back pain and trunk instability with strong efforts; decreased range of motion of the cervical and lumbar spine; loss of balance with strong efforts; tolerance for sitting for about ten minutes; ability for above shoulder activities and bilateral grip strength; and an inability to lift more than two pounds, squat, crawl or kneel. (R. 296.) Dr. Krishna also noted that Plaintiff's cervical spine range of motion included: flexion of thirty-five degrees, extension of thirty degrees, rotation of forty degrees bilaterally and

lateral flexion of twenty degrees bilaterally.  (R. 296.)  Plaintiff's lumbar spine range of motion

included: flexion of fifty-five degrees, extension of five degrees, rotation of ten degrees

bilaterally and lateral flexion of ten degrees bilaterally.  (R. 296.)  Dr. Krishna opined that

Plaintiff was not able to meet the requirements of sedentary work according to workers'

compensation guidelines.  (R. 297.)

On August 7, 2014, Dr. Krishna completed a medical assessment of Plaintiff's ability to

do work-related activities.  (R. 302–04.)  Based on upper and lower MRI evidence, Dr. Krishna

opined that Plaintiff could occasionally lift and/or carry a maximum of less than ten pounds but

not ten pounds and sit with periodic alternate sitting and standing to relieve pain or discomfort

during an eight-hour workday.  (R. 302–03.)  Dr. Krishna also opined, based on the same MRI

findings, that Plaintiff was limited in his ability to push and/or pull with upper and lower

extremities.  (R. 303.)  Dr. Krishna opined that Plaintiff could stand and/or walk for less than two

hours in an eight-hour workday based on four-out-of-five weakness in his right leg and

paraspinal tenderness.  (R. 303.)

### 3.  Bay Ridge Medical Care – Dr. Mehrdad Hedayatnia.

Dr. Krishna referred Plaintiff to Bay Ridge Medical Care, where he was treated by

Mehrdad Hedayatnia, M.D., for pain management.  (R. 287.)  On June 11 and July 16, 2013,

Plaintiff received cervical epidural steroid, lumbosacral paravertebral and cervical paravertebral

trigger point injections and a prescription for Nucynta.  (R. 269–70.)  On August 15, 2013,

Plaintiff received cervical epidural steroid and lumbosacral paravertebral trigger point injections

and Dr. Hedayatnia noted that Plaintiff "showed significant improvement with the previous

injection."  (R. 271.)  Plaintiff's Nucynta prescription was renewed.  (R. 271.)  On September 17,

2013, Dr. Hedayatnia wrote to Dr. Krishna indicating that although some of Plaintiff's radicular

symptoms of the upper extremity had improved, Plaintiff complained of neck pain with radiation to the bilateral shoulder and all over the spine.  (R. 287.)

On November 7, 2013[6] and January 21, 2014,[7] Dr. Hedayatnia diagnosed Plaintiff with cervical radiculopathy and paraspinal muscle spasm.  (R. 273–76.)  On both occasions, Plaintiff received cervical epidural steroid, lumbosacral paravertebral and trigger point injections. (R. 273–76.)  Plaintiff had "good results with previous injections."  (R. 273–76.)  On February 19, 2014, Dr. Hedeyatnia referred Plaintiff to chiropractor Dr. Keenan and noted that spine surgeon Dr. Pauline recommended continued epidural steroid injections.  (R. 279.)  Dr. Hedeyatnia examined Plaintiff and noted normal motor function.  (R. 279.)  Dr. Hedeyatnia reported that Plaintiff had mild pain in lumbar extension and rotation and both straight leg raises, and moderate pain in lumbar flexion, paraspinous process palpation and trigger points.  (R. 279.) Plaintiff had an antalgic gait.  (R. 279.)  Plaintiff received lumbosacral paravertebral epidural steroid and trigger point injections.  (R. 279.)  On July 19, 2014, Dr. Hedayatnia reported results substantially similar to those on February 19, 2014 and Plaintiff received lumbosacral paravertebral epidural steroid and trigger point injections.  (R. 281.)

### ii.  Consultative examiners

#### 1.  Physical Limitations – Dr. Louis Tranese

On January 24, 2013, Louis Tranese, D.O., conducted a consultative internal medicine examination of Plaintiff.  (R. 216–20.)  Plaintiff complained of seven months of localized mid-

---

[6] Dr. Hedayatnia noted Plaintiff had positive tenderness in the neck with radiation to right upper extremity, moderate to severe paraspinal muscle spasm and numbness of the right upper extremity.  (R. 273.)

[7] Dr. Hedayatnia noted Plaintiff showed numbness of the upper extremity, decreased range of motion of the cervical spine and evidence of foraminal stenosis under radiologient studies.  (R. 277.)

back pain without radiation to the legs. (R. 216.) Plaintiff described the pain as a dull, stiff ache aggravated with standing for long periods, walking extended distances, bending and heavy lifting. (R. 216.) Plaintiff did not complain of numbness, tingling, or weakness of the legs. (R. 216.) Plaintiff reported back pain relief with muscle relaxant medications, position changes and rest. (R. 216.) Plaintiff complained of ankle pain aggravated with walking, standing long periods and stair climbing. (R. 216.) Plaintiff reported "mild temporary pain relief" from his ankle pain with anti-inflammatory medications. (R. 216.) Plaintiff complained of frequent wheezing and shortness of breath that is more prevalent during the summer and spring seasons and nearly daily use of an inhaler. (R. 216.) Although Plaintiff reported independence in bathing, dressing and grooming himself, he reported dependence on others for cooking, cleaning, laundry and shopping "secondary to back pain." (R. 217.)

Dr. Tranese performed a physical examination and found that Plaintiff's gait and station were normal, he could walk on heels and toes, squat and rise from a chair without difficulty and did not require assistance getting on or off the examination table. (R. 217.) Dr. Tranese found Plaintiff had a full range of motion in his cervical spine. (R. 218.) Dr. Tranese found "mild thoracic scoliosis, but no kyphosis" in the thoracic spine. (R. 218.) Dr. Tranese found limitation in Plaintiff's lumbar spine, noting flexion of seventy-five degrees limited by report of pain but otherwise full extension, lateral flexion and rotary movements. (R. 218.) Dr. Tranese noted "generalized thoracic and upper lumbar paraspinal tenderness bilaterally." (R. 218.) Plaintiff's deep tendon reflexes were physiologic and equal in upper and lower extremities and had full strength of "5/5." (R. 218.) Plaintiff had normal fine motor activity of the hands with full grip strength of "5/5" in both hands. (R. 218.) Dr. Tranese reviewed an x-ray of Plaintiff's right ankle from January 24, 2013 that showed "an old healed spiral fracture of the distal fibular shaft"

and that the joint spaces were "relatively well maintained."  (R. 218, 220.)

Dr. Tranese diagnosed Plaintiff with a history of right ankle fracture, right ankle pain, back pain secondary to scoliosis and history of asthma as reported by Plaintiff.  (R. 219.)  Dr. Tranese opined that Plaintiff had "mild to moderate" restriction with walking long distances, frequent stair climbing, and heavy lifting, and "mild restriction" with standing long periods, and with frequent bending.  (R. 219.)  He recommended that Plaintiff avoid exposure to environments with increased pollen/dander/dust and toxic fumes/odors.  (R. 219.)  Dr. Tranese gave Plaintiff a "fair to good" prognosis.  (R. 219.)

### 2.  Mental Health Limitations

### A.  Dr. Johanina McCormick

On January 24, 2013, Johanina McCormick, Ph.D., conducted a consultative psychiatric evaluation of Plaintiff.  (R. 212–15.)  Plaintiff traveled by cab one mile to the evaluation. (R. 212.)  Plaintiff explained that he had been on medical leave since July of 2012, when he developed back pain and mental health issues that have made it difficult for him to work. (R. 212.)  Plaintiff reported no hospitalizations due to his psychiatric impairments and explained that he saw a psychiatrist once a month and a therapist once a week to treat his anxiety and depression.[8]  (R. 212.)  Plaintiff was prescribed Proxetine, Lorazepam and Zolpidem.  (R. 212.)

Plaintiff reported "excessive apprehension, worry and restlessness related to anxiety symptoms" and "dysphoric mood [and] concentration difficulty" related to depressive symptoms. (R. 212.)  Plaintiff reported that he could dress, bath and groom himself but that he could not prepare food, clean, shop or do his laundry.  (R. 214.)  Plaintiff managed his own money with the

---

[8]  Plaintiff reported one hospitalization in 2012 due to his allergies and indicated that he suffered from scoliosis and asthma.  (R. 212.)

help of his father.  (R. 214.)  Plaintiff did not drive and he could not take public transportation by himself; as an example, Plaintiff explained that his father put him in a cab for the consultation and would also arrange for a cab to retrieve him after the consultation.  (R. 214.)  Plaintiff reported that he could not complete "daily living activities" due to his "memory and concentration problems in terms of pain" and that his father assisted him with "daily living activities."  (R. 214.)  Plaintiff did not socialize but his family relationships were "supportive." (R. 214.)  Plaintiff spent his days drawing and attending medical appointments.  (R. 214.)

Dr. McCormick completed a mental status examination finding that Plaintiff's "demeanor and responsiveness to questions was cooperative," and his manner of relating, social skills and overall presentation were "adequate."  (R. 213.)  Plaintiff's mood was dysthymic.  (R. 213.) Plaintiff's recent and remote memory skills were "mildly impaired secondary [to] depression, anxiety and possible limited intellectual functioning."  (R. 214.)  Plaintiff was able to recall three objects immediately and no objects after five minutes and no digits forward or backwards. (R. 214.)  Plaintiff's intellectual functioning appeared to be below-average and his "general fund of information" was "somewhat limited."  (R. 214.)  Plaintiff's insight and judgment were "fair." (R. 214.)  The remaining results were within normal measures.  (R. 213–14.)

Dr. McCormick opined that Plaintiff can follow and understand simple directions and instructions; perform simple tasks independently; can make appropriate decisions; and can maintain attention and concentration.  (R. 214.)  Dr. McCormick found that Plaintiff cannot maintain a regular schedule; can learn new tasks with help; cannot perform complex tasks independently without supervision; cannot relate adequately with others; and cannot appropriately deal with stress.  (R. 214.)  Dr. McCormick found that these difficulties are a result of Plaintiff's symptoms of depression, anxiety and short-term memory deficits.  (R. 214.)  Dr.

McCormick diagnosed Plaintiff with depressive and anxiety disorders, not otherwise specified, and scoliosis. (R. 215.) Dr. McCormick recommended that Plaintiff continue psychological and psychiatric treatment and participate in vocational training and rehabilitation. (R. 215.) Dr. McCormick's prognosis was "fair" given Plaintiff's young age and positive attitude. (R. 215.)

## B. Dr. Ellis Charles

On February 1, 2013, Ellis Charles, M.D., a state agency psychiatric consultant, reviewed the medical evidence in the record and opined that Plaintiff's spine disorder was severe but his affective and anxiety-related disorders were not severe. (R. 70–71.) Dr. Charles opined that Plaintiff had only mild difficulties with maintaining social function and concentration, persistence or pace and no restrictions of daily living or repeated episodes of decompensation. (R. 70.)

### d. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 3, 2012, the date that Plaintiff identified as the onset date of his disability. (R. 81.) At step two, the ALJ found that Plaintiff had the following severe impairments: "scoliosis, cervical and lumbar radiculopathy, s/p right ankle fracture, asthma, [and] depressive disorder." (R. 81.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet, or are equal to, the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 81.) At step four, the ALJ found that Plaintiff has the RFC to perform "simple tasks" and "sedentary work . . . except that he can only occasionally use

his non-dominant hand for fingering, and is only occasionally able to tolerate exposure to respiratory irritants." (R. 83.)

In assessing the opinion evidence, the ALJ assigned "some weight" to the opinion of Dr. Krishna, Plaintiff's treating neurologist. (R. 84.) The ALJ assigned "little weight" to Dr. Krishna's opinion that Plaintiff was totally disabled, "as this is a finding reserved to the [C]ommissioner." (R. 84.) The ALJ also assigned "little weight" to the opinion of Dr. Gordon that Plaintiff was limited in his ability to push or pull due to ankle pain. (R. 84–85.) The ALJ assigned "great weight" to the opinion of consultative internal medicine examiner Dr. Tranese because it was "consistent with clinical findings showing the claimant is capable of work at the sedentary exertional level." (R. 85.) The ALJ assigned "some weight" to the opinion of consultative psychiatric evaluator Dr. McCormick. (R. 85.)

After reviewing the medical evidence and Plaintiff's testimony, the ALJ concluded that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 84.) The ALJ noted that although Plaintiff alleges debilitating pain symptoms in his back, Dr. Krishna's motor examination on July 29, 2013 showed Plaintiff had "voluntary movements, that the muscles in his upper and lower extremity were symmetrical, that there was no atrophy present and that his muscle tone was normal with small, continuous resistance to passive movement." (R. 84.)

Finally, the ALJ determined that Plaintiff was not capable of performing his past relevant work, but concluded that based on Plaintiff's age, education, work experience and RFC, "there are jobs that exist in significant numbers in the national economy" that Plaintiff can perform

including work as a ticket checker, document preparer and order clerk.  (R. 86.)  The ALJ determined that since July 3, 2012, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA.  (R. 87.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*,

3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a

remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

    **b.   Availability of benefits**

Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the SSA. To be considered disabled under the SSA, a plaintiff must

establish his or her inability "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a

five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second

Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed. If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work. If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations. When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled. However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work. Finally, if the claimant

is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the ALJ erred in weighing the evidence and, as a result, rendered an incorrect RFC assessment and deficient hypotheticals to the vocational expert. (Pl. Mem. 12.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ properly weighed the evidence and that the decision is supported by substantial evidence. (Comm'r Mem. 17, 25.)

### i. The ALJ improperly weighed the evidence

Plaintiff argues that the ALJ improperly violated the treating physician rule by assigning greater weight to consultative examiner Dr. Tranese's opinion than the weight he assigned to treating neurologist Dr. Krishna's opinion and by failing to assign more weight to consultative psychologist Dr. McCormick's opinion. (Pl. Mem. 9–11.) The Commissioner argues that the ALJ properly weighed the medical opinion evidence.[9] (Comm'r Mem. 17–23.)

---

[9] The Commissioner also argues that the ALJ properly weighed Plaintiff's credibility but Plaintiff does not assert an argument that his credibility was improperly weighed. (Comm'r

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[10] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at

---

Mem. 24.) The only mention of credibility in Plaintiff's brief is that "the plaintiff has a very solid employment history. His track record is not that of a malingerer or a disassembler. It is a record that bears witness to the plaintiff's work ethic and lends credibility to his claim that he wants to work but cannot work." (Pl. Mem. 11.) Accordingly, the Court does not consider the ALJ's weighing of Plaintiff's credibility.

[10] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).

418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32.  While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken.  *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

Under the SSA, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]."  20 C.F.R. § 416.902.  In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419.  This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d

at 13)). Nevertheless, the opinions of consultative examining medical sources can constitute substantial evidence in support of the ALJ's decision if they are supported by evidence in the record. *See Petrie*, 412 F. App'x at 405 ("The report of a consultative physician may constitute [] substantial evidence [by which to compare the treating physician's opinion]."); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence." (citations omitted)).

### 1. Treating-physician rule – Dr. Krishna

In August of 2014, Dr. Krishna opined that Plaintiff was "totally disabled," (R. 246), Plaintiff could only lift less than ten pounds,[11] could sit but needed to alternate sitting and standing to relieve pain and discomfort and could stand for fewer than two hours in an eight-hour day, (R. 302–04). The ALJ accorded Dr. Krishna's opinions "some weight" and completely discounted the opinion that Plaintiff was disabled. (R. 84.)

The ALJ did not adequately explain the reasons for discounting the weight assigned to Dr. Krishna's medical opinion of Plaintiff's functional abilities. (R. 84.) The ALJ assessed Dr. Krishna's findings without analysis or explanation: "Dr. Krishna's opinion was taken into consideration when crafting [Plaintiff's RFC] and given some weight by reducing the claimant to work at the sedentary exertional level. Limited weight is accorded to his opinion that [Plaintiff] was totally disabled however, as this is a finding reserved to the commissioner." (R. 84.) The ALJ correctly noted that Dr. Krishna's opinion regarding Plaintiff's disability is not entitled to "controlling weight." *See Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (noting that a

---

[11] In October of 2013, Dr. Krishna opined that Plaintiff could lift two pounds and could stand for ten minutes at a time. (R. 296.)

treating physician's opinion that the claimant "was 'temporarily totally disabled' [wa]s not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner" (first citing 20 C.F.R. § 404.1527(e)(1); and then citing *Snell*, 177 F.3d at 133)). However, the ALJ erred by not explaining the reasons for discounting the remainder of Dr. Krishna's opinions, which opinions are relevant to Plaintiff's capacity for sedentary work as they state that Plaintiff can lift two pounds and only less than ten pounds, (R. 296, 302). *See* 20 C.F.R. § 404.1567 (Sedentary work requires sitting for approximately six hours in an eight-hour work day, occasional walking and standing for no more than two hours during a work day, and lifting up to ten pounds.); *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("Because the ALJ rested his rejection of [the treating physician's] opinion on flawed reasoning and failed to provide any other reasons for rejecting the opinion, the ALJ erred.").

So long as Dr. Krishna's medical opinions are supported by acceptable laboratory and clinical diagnostic techniques, Dr. Krishna's opinion is entitled to controlling weight if it does not conflict with other substantial evidence in the record. *See Lesterhuis*, 805 F.3d at 88. Dr. Krishna's findings were based on MRIs of Plaintiff's upper and lower back, weakness in Plaintiff's right leg and paraspinal tenderness. (R. 302–03.) The ALJ discounted the findings without any explanation or consideration of the underlying evidence Dr. Krishna relied upon. (R. 84.) Because Dr. Krishna's medical opinion is entitled to "controlling weight" provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [Plaintiff's] record," it was error for the ALJ to discredit his findings, particularly here, where the ALJ did not indicate that Dr. Krishna's opinion was unsupported or inconsistent with other evidence in the record. *See* 20 C.F.R. § 404.1527(c)(2).

Rather than according Dr. Krishna's findings controlling weight, the ALJ assigned "great weight" to the opinion of consultative internal medicine examiner Dr. Tranese, finding that his opinion was "consistent with clinical findings showing the claimant is capable of work at the sedentary exertional level." (R. 85.) The Commissioner's argument that the ALJ properly considered the opinions of consultative examiner Dr. Tranese in assessing Dr. Krishna's opinion, (Comm'r Mem. 18–19), is not persuasive. Although the ALJ could have weighed Dr. Tranese's opinion against Dr. Krishna's and determined that Dr. Tranese's opinion was more consistent with the record evidence and inconsistent with Dr. Krishna's opinion, *Petrie*, 412 F. App'x at 405, the ALJ did not do so. Instead, the ALJ accorded Dr. Tranese's findings "great weight" based on one consultative examination, for which Plaintiff argues Dr. Tranese did not have the MRI and electrodiagnostic studies, without any discussion comparing the findings or opinions of Dr. Krishna to those of Dr. Tranese.[12] (Pl. Mem. 10; R. 85.) The failure to provide "good reasons" for not crediting Dr. Krishna's medical opinion and substituting it for that of Dr. Tranese, by itself, warrants remand. *See Selian*, 708 F.3d at 419 (citing *Snell*, 177 F.3d at 133).

### 2. Consultative psychologist – Dr. McCormick

Dr. McCormick opined that Plaintiff could not maintain a regular schedule, can learn new tasks with help, cannot perform complex tasks independently without supervision, cannot relate adequately with others, and cannot appropriately deal with stress based on Plaintiff's symptoms of depression, anxiety and short-term memory deficits. (R. 214.) The ALJ accorded Dr. McCormick's opinions "some weight." (R. 85.)

Unlike a treating physician's opinion, the opinion of a consultative examiner does not

---

[12] The only laboratory testing referenced in Dr. Tranese's report is the x-ray of Plaintiff's right ankle. (R. 218.)

bind an ALJ. *Pellam v. Astrue*, 508 F. App'x 87, 89–90 (2d Cir. 2013) ("There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations . . . ."). However, the ALJ should weigh a consultative examiner's opinion using the same factors used to weigh the opinion of a treating physician, particularly where there is not a treating source opinion. *Daniels v. Colvin*, No. 14-CV-2354, 2015 WL 1000112, at *17 (S.D.N.Y. Mar. 5, 2015) ("When there is no treating physician's opinion, the Commissioner must still consider whether the consultative opinions are supported by and consistent with the other evidence in the record . . . ."); *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 267 (N.D.N.Y. 2013) ("Where, as here, there is no treating source to be given presumptive effect, all medical opinions in the record must be assessed. Weight is given to an opinion based upon consideration of the following factors: treatment relationship, length of treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors." (citing 20 C.F.R. §§ 416.927(c), 416.927(c)(1)–(6)); *Speilberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) ("factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)).

Here, although the ALJ discussed the findings of Dr. McCormick, the ALJ did not provide any reason for the weight assigned to Dr. McCormick's opinion, instead concluding: "Dr. McCormick's opinion was considered and given some weight by limiting the claimant to simple tasks." (R. 85.) Dr. McCormick's evaluation of Plaintiff's recent and remote memory skills showed mild impairment secondary to depression, anxiety and possible limited intellectual functioning because Plaintiff was able to recall only three objects immediately and no objects after five minutes. (R. 214.) Plaintiff was not able to recall any digits forward or backward.

(R. 214.) Dr. McCormick also reported that Plaintiff had a dysthymic mood, only fair insight and judgment, and below-average intellectual functioning. (R. 213–14.) Dr. McCormick based her findings on Plaintiff's symptoms of depression, anxiety and short-term memory deficits. (R. 214.) The ALJ erred by not explaining the reason for assigning "some weight" to Dr. McCormick's opinion, which opinion was supported by her mental status examination and in-person assessment of Plaintiff, particularly because Dr. McCormick was the only examining psychiatrist to opine as to Plaintiff's mental limitations.[13] *See Fuimo*, 948 F. Supp. 2d at 268 (finding error in not affording consultative examiner additional weight where the relevant factors were not considered and would have led to attributing significant weight to the opinion); *cf. Daniels*, 2015 WL 1000112, at *18 (finding the ALJ properly weighed consultative examiner's opinion where "[s]he compared the medical evidence in the record to assess whether the opinions were consistent with one another and consistent with [the plaintiff's] own account" and "[i]n weighing all the evidence, [the ALJ] gave the most weight to opinions that were supported by and consistent with that other evidence"); *Bonet ex rel. T.B. v. Astrue*, No. 11-CV-1140, 2012 WL 3544830, at *6 (N.D.N.Y. Aug. 16, 2012) (finding no error in according consultative psychologist only "little weight" because "the ALJ considered the relevant factors and properly explained his reasoning for discounting the weight").

The Commissioner argues that Dr. McCormick's opinion was properly discounted because it "appeared to be based on plaintiff's subjective reports," and was inconsistent with

---

[13] The Court notes that this error was not harmless. Even though the vocational expert testified that if Plaintiff were limited to performing simple tasks, understanding simple instructions and working in a low-stress environment, he would still be able to perform work as a ticket checker, document preparer or order clerk, (R. 34–35), these limitations do not take into account Dr. McCormick's finding that Plaintiff was limited in his ability to interact with other people and, as Plaintiff argues, the jobs of ticket taker and order clerk "involve constant interaction with the public," (Pl. Mem. 11).

treating physician Dr. Krishna's mental status examination results and non-examining

consultative psychiatrist Dr. Charles' findings.  (Comm'r Mem. 22–23.)  The Court cannot

consider the Commissioner's post-hoc justifications that were not addressed by the ALJ as a

basis to affirm the ALJ's decision.  *See McAllister v. Colvin*, --- F. Supp. 3d ---, ---, 2016 WL

4717988, at *17 (E.D.N.Y. Sept. 9, 2016) ("Such *post hoc* rationalizations are insufficient, as a

matter of law, to bolster the ALJ's decision."); *Demera v. Astrue*, No. 12-CV-432, 2013 WL

391006, at *3 n.3 (E.D.N.Y. Jan. 24, 2013) ("The ALJ did not provide these explanations,

however, and *post hoc* rationalizations for the ALJ's decision are not entitled to any weight."

(citing *Snell*, 177 F.3d at 134)).

Because the Court remands to allow proper weighing of the medical evidence, which may

affect the ALJ's RFC assessment, the Court does not address Plaintiff's argument that the

hypotheticals were deficient at step five.

### III.  Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted,

and the Commissioner's cross-motion for judgment on the pleadings is denied.  The

Commissioner's decision is vacated, and this action is remanded for further administrative

proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: March 24, 2017
       Brooklyn, New York